United States District Court

For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ESTATE OF DAVID BURKHART,
et al.,

        Plaintiffs,

       v.

UNITED STATES OF AMERICA,

        Defendant.

_____/

No. C 07-5467 PJH

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

    Defendant's motion for summary judgment came on for hearing before this court on April 15, 2009. Plaintiffs David T. Burkhart and Sally A. Burkhart appeared in propria persona. Sally A. Burkhart also appeared for plaintiff Estate of David Burkhart. Defendant United States of America appeared by its counsel Assistant United States Attorney Jennifer S. Wang. Having read the parties' papers and carefully considered their arguments, and the relevant legal authority, and good cause appearing, the court hereby GRANTS defendant's motion.

**BACKGROUND**

    This is a case brought under the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq., arising from the death of David Burkhart, and alleging causes of action for medical malpractice, elder abuse, and negligence. Plaintiffs Sally A. Burkhart and David T. Burkhart, Mr. Burkhart's widow and son, allege claims for wrongful death; and Ms. Burkhart asserts survival claims on behalf of Mr. Burkhart's estate ("the Estate").

    Mr. Burkhart had multiple admissions to medical facilities operated by the United States Department of Veterans Affairs ("VA"). At the time of his death on October 26,

United States District Court

For the Northern District of California

1   2003, he had been temporarily admitted to the VA's Livermore Nursing Home Care Unit

2   ("VA Livermore"), to permit his family time to arrange for placement in a private skilled

3   nursing home.

4     In October 2003, Mr. Burkhart was almost 73 years old.  His medical records

5   indicate that he had multiple serious ongoing non-acute medical problems, including

6   hypertension; a previous stroke; type 2 diabetes; chronic osteomyelitis (infection of the

7   bone or bone marrow); peripheral vascular disease; coronary artery disease; chronic renal

8   insufficiency; hypothyroidism; depression; congestive heart failure; and multi-infarct

9   dementia (deterioration of mental function caused by strokes).  In addition, as a result of

10  the osteomyelitis, he had developed a chronic leg ulcer that required ongoing wound care.

11    Following a stroke in 1990, Mr. Burkhart was confined to a wheelchair.  He had

12  cardiac bypass surgery in 1999.  Because Mr. Burkhart's medical illnesses were not

13  related to his military service, he was not eligible for long-term placement in the VA's

14  nursing home care facilities.

15    In May 1998, Mr. Burkhart completed a VA Living Will/VA Advance Directive

16  ("Advance Directive"), in which he stated,

17    [S]hould I have a terminal illness . . . as determined by my attending (or
  primary treating) physician, with the concurrence of another physician, I direct

18    that such life-sustaining treatment . . . be withheld or withdrawn, and that I be
  permitted to die naturally with only the administration of such medical care

19    and procedures deemed necessary to help make me comfortable.

20  For the purposes of the Advance Directive, "terminal illness" includes "conditions where

21  death is imminent . . . ."

22    In May 1998, Mr. Burkhart also executed a VA durable power of attorney for health

23  care, appointing his son, David T. Burkhart, as his health-care agent.  The power of

24  attorney stated, "This appointment shall take effect only if I am unable to make or

25  communicate my own health care decisions," and "I instruct my agent to follow those

26  preferences that I previously expressed, when I was competent to make such decisions."

27    On September 12, 2002, Mr. Burkhart was admitted to the VA Palo Alto Hospital

28  ("VA Palo Alto") for placement at a skilled nursing home because Ms. Burkhart, Mr.

United States District Court

For the Northern District of California

1  Burkhart's then-ex-wife and primary caregiver, was "overwhelmed at home."  While at VA

2  Palo Alto, Mr. Burkhart was given lisinopril to treat his hypertension.  The lisinopril was

3  discontinued because Mr. Burkhart's potassium level and creatinine increased beyond

4  normal levels.

5       On September 23, 2002, Mr. Burkhart was discharged to the VA Menlo Park Nursing

6  Home Care Unit ("VA Menlo Park"), where his weight was measured at approximately 207

7  pounds.  Staff physician Dr. William A. Lyons wrote a "do not resuscitate/do not intubate"

8  ("DNR/DNI") order for Mr. Burkhart after discussion with David T. Burkhart.  Dr. Lyons' note

9  on September 25, 2002, stated that David T. Burkhart had instructed that Mr. Burkhart "is

10  not to undergo resuscitation in the event of cardiac or respir[atory] arrest."

11       At VA Menlo Park, lisinopril was started and then discontinued on September 25,

12  2002.  On September 25, 2002, Mr. Burkhart was transferred back to VA Palo Alto,

13  presenting with hyperkalemia (elevated potassium level) and elevated white blood cell

14  ("WBC") count likely due to infection in his leg due to his osteomyelitis.  By the morning of

15  September 27, 2002, Mr. Burkhart's hyperkalemia had resolved, and his WBC count was

16  trending to normal levels.

17       The medical record from September 27, 2002 states that Dr. Timothy Kuo reaffirmed

18  with Mr. Burkhart's son that Mr. Burkhart remained on DNR/DNI and that treatment would

19  not include intubation or resuscitation.

20       On September 30, 2002, Mr. Burkhart was discharged from VA Palo Alto to Terreno

21  Gardens Convalescent Hospital ("Terreno Gardens"), a skilled nursing facility.  David T.

22  Burkhart completed a "Consent to Withhold CPR" form, confirming his understanding that

23  "an order for 'No CPR' means that if [Mr. Burkhart] suffers a cardiac or respiratory arrest,

24  no efforts will be made to resuscitate him," and gave his "consent for an order to not use

25  cardiopulmonary resuscitation and request[ed] that in the event of a cardio and/or

26  respiratory arrest that CPR be withheld."  In signing the "Consent to Withhold CPR" form,

27  David T. Burkhart stated, "I warrant and represent that I am carrying out what I believe to

28  be the wishes of [Mr. Burkhart]."

**United States District Court**
For the Northern District of California

1    On October 3, 2002, Mr. Burkhart was sent from Terreno Gardens to the emergency

2 room at Good Samaritan Hospital in San Jose, California with altered level of

3 consciousness with chest congestion and shortness of breath, and admitted for congestive

4 heart failure exacerbation.  Mr. Burkhart was discharged on October 7, 2002, to Terreno

5 Gardens.

6    Approximately ten months later, on August 21, 2003, Mr. Burkhart was discharged

7 from Terreno Gardens to Ms. Burkhart's care.  On August 23, 2003, Mr. Burkhart was

8 admitted to VA Palo Alto for leg cellulitis and congestive heart failure exacerbation.  Mr.

9 Burkhart was discharged on August 25, 2003 to his home under Ms. Burkhart's care.

10    On Sunday, September 21, 2003, Mr. Burkhart presented at the emergency room at

11 VA Palo Alto with generalized weakness.  Dr. Edwin Lai, the attending emergency room

12 physician, obtained a medical history from Ms. Burkhart and performed a physical

13 examination of Mr. Burkhart that included laboratory testing.  Dr. Lai found no evidence of

14 acute infection or fever, and no acute medical indication for inpatient admission.

15    According to Dr. Lai's September 21, 2003 note, he informed Ms. Burkhart that there

16 was no acute medical indication for Mr. Burkhart's admission, but Ms. Burkhart requested

17 that Dr. Lai admit Mr. Burkhart for one night because she was concerned about her inability

18 to move her husband in and out of bed.  Dr. Lai noted that Mr. Burkhart clearly had long

19 term care needs, but Ms. Burkhart was resistant to placing Mr. Burkhart in a skilled nursing

20 facility.  Dr. Lai discharged Mr. Burkhart to his home on September 21, 2003, with follow-up

21 with Mr. Burkhart's Home Based Primary Care ("HBPC") provider, Deena Bunzel, a nurse

22 practitioner.

23    On Monday, September 22, 2003, Ms. Bunzel made a home visit to Mr. Burkhart.

24 Ms. Bunzel noted that Mr. Burkhart had fallen to the floor over the weekend, that Mr.

25 Burkhart was "becoming more deconditioned and really is too high a level care" for Ms.

26 Burkhart, and that despite Ms. Burkhart's refusal to place Mr. Burkhart in a skilled nursing

27 facility, he "definitely is appropriate for SNF [skilled nursing facility] level."

28    On Tuesday, September 23, 2003, VA Palo Alto admitted Mr. Burkhart.  Admission

United States District Court

For the Northern District of California

records noted that Mr. Burkhart had had a recent hospitalization on August 23, 2003 for leg cellulitis and congestive heart failure exacerbation, and had been discharged home despite recommendations that he was appropriate for placement at a skilled nursing facility; that over the last several weeks, he had been noted to have increasing weakness at home with multiple falls; and that he had fallen at home on September 22, 2003.

One of the goals of Mr. Burkhart's admission was to ensure that he was medically stable so that he could be discharged to a skilled nursing home.  Dr. Joshua Knowles, a medicine intern at the hospital in September 2003, states in a declaration that Mr. Burkhart was admitted for failure to thrive at home under his wife's care.

Upon admission to VA Palo Alto, Mr. Burkhart was assessed with generalized weakness from a combination of his multiple chronic illnesses with overwhelming care needs and Ms. Burkhart's inability to provide for that care at home. On September 24, 2003, Dr. Stephanie Harmon wrote that Mr. Burkhart's "HBPC notes have stated that pt's [Mr. Burkhart's] gradually worsening weakness is chronic."  Upon his admission, Mr. Burkhart was placed on "full code," pending discussions with David T. Burkhart regarding the appropriate code status for Mr. Burkhart.

A September 24, 2003, note by Arthur E. Reichstadt, a VA social worker, stated that Mr. Reichstadt contacted Ms. Burkhart regarding her long term care plans for Mr. Burkhart and that Ms. Burkhart refused Mr. Burkhart's discharge to a skilled nursing facility.  Mr. Reichstadt noted that Dr. Harmon had informed Ms. Burkhart that Mr. Burkhart would continue to decline and lose functioning due to his multiple illnesses.  Mr. Reichstadt also requested a consult with the Physical Medicine and Rehabilitation Department.  After evaluating Mr. Burkhart, Dr. John E. Stavrakos advised that Mr. Burkhart "was not likely safe for [discharge] home" and would benefit from a stay at a skilled nursing facility.

On September 25, 2003, Dr. Knowles noted that Mr. Burkhart "has multiple medical problems making it difficult to care for him at him, including weakness."  Laboratory and diagnostic test results showed that Mr. Burkhart did not appear to have any acute medical issue preventing his discharge.  However, Dr. Knowles noted on September 26, 2003, that

United States District Court

For the Northern District of California

1  it was a "difficult situation," as reflected in the note of that same date by Mr. Reichstadt.

2      Mr. Reichstadt's note explained in some detail the disagreement among David T.

3  Burkhart, Mr. Burkhart's daughter Lisa, and Ms. Burkhart regarding Mr. Burkhart's

4  placement following discharge.  Mr. Burkhart's children supported Mr. Burkhart's return to

5  Terreno Gardens, but Ms. Burkhart did not.  Mr. Reichstadt noted that "[t]he remedy, i.e. 'all

6  he [Mr. Burkhart] needs is rehab in order to get back home' she [Ms. Burkhart] supports

7  appears inadequate and simplistic with a marked degree of denial in relation to the

8  chronicity [sic] of his condition and multiple diagnosis [sic]."  He added that the "Medical

9  Team has sought to convey the severity of his condition and need for a skilled level of care

10  which wife has been unable to accept."

11      At Mr. Reichstadt's request, Dr. Donna Heinle, the Medical Director at VA Livermore,

12  agreed to accept Mr. Burkhart at VA Livermore to allow his family additional time to reach

13  an agreement on Mr. Burkhart's placement in a skilled nursing facility.  Prior to Mr.

14  Burkhart's discharge from VA Palo Alto and transfer to VA Livermore on September 29,

15  2003, nurses reported that he was "noncompliant" and "very uncooperative and combative

16  this day."  He was given Ativan® IM twice and Haldol®, and was transferred by ambulance

17  at 12:25 after earlier attempts had failed.

18      VA Livermore admission records noted that "[i]t appears that his [Mr. Burkhart's]

19  generalized weakness is not new and the recommendation for long-term care has been

20  on-going."

21      Mr. Burkhart weighed approximately 174 pounds on September 29, 2003. On

22  September 29, 2003, Dr. Monique Kuo, a staff physician at VA Livermore, recorded that

23  Mr. Burkhart stated that he wanted "resuscitative efforts made if there was a chance he

24  could be brought back to his current state, but did not want to be kept alive on machines if

25  he were in a coma or had no quality of life," and listed Mr. Burkhart's code status as

26  DNR/unwitnessed.

27      A dietetic technician evaluated Mr. Burkhart's nutrition status upon his arrival to VA

28  Livermore.  A comprehensive nutrition therapy assessment was completed by Insuk

1    Durham, a dietician, on September 30, 2003.  In her October 6, 2003 note, Ms. Durham

2    stated that nurses reported that at times Mr. Burkhart would eat very well (over 80 percent

3    of his meals), but at other times would decline to eat.  Ms. Durham noted that Mr.

4    Burkhart's intake was fair.

5         On October 14, 2003, Ms. Durham noted that she observed Mr. Burkhart self-feed

6    himself 80 percent of his lunch, that Mr. Burkhart's intake had improved that week, and that

7    he was meeting his nutritional needs.  On October 21, 2003, Ms. Durham noted that nurses

8    reported that Mr. Burkhart's food intake greatly varied and that at times, Mr. Burkhart

9    declined whole meals.  Diet changes were suggested on October 21, 2003 to increase Mr.

10   Burkhart's nutrition intake.  On October 21, 2003, Mr. Burkhart's weight was approximately

11   165 pounds.

12        The nursing note on October 24, 2003, stated that Mr. Burkhart "drinks a lot of ice

13   water," but refused to eat and take his medications.  On October 24, 2003, Dr. Kuo noted

14   that she had spoken with David T. Burkhart regarding his father's condition.  Dr. Kuo told

15   David T. Burkhart that Mr. Burkhart had been refusing to take his medicines regularly, and

16   that staff assisting Mr. Burkhart with his meals reported that Mr. Burkhart would refuse to

17   eat, verbally abused staff, and had tried to hit staff.  Dr. Kuo recorded that "Dave is aware

18   of his father's condition and said he would try to visit soon to talk with his father."

19        According to the medical records, during his stay at VA Livermore, Mr. Burkhart at

20   times resisted care and was uncooperative, and in approximately the last ten days of his

21   stay had poor oral intake, but was drinking water.  The medical record also showed that Mr.

22   Burkhart received daily wound care for his leg.

23        VA Livermore social worker, Geri Root-Mauthe, aided Mr. Burkhart's family in

24   pursuing Mr. Burkhart's placement in a private skilled nursing home.  In an October 8, 2003

25   note, Ms. Root-Mauthe stated that she had discussed discharge placement plans for Mr.

26   Burkhart with David T. Burkhart, faxed him a list of skilled nursing facilities, and requested

27   that he provide her with two or three preferred facilities so that she could send them

28   information regarding Mr. Burkhart's care.

United States District Court

For the Northern District of California

1    On Saturday, October 25, 2003, Mr. Burkhart refused his dinner, but took all of his

2  medications at approximately 5:00 p.m., drank ice water, two sips of milk, and a sip of

3  apple sauce.  Mr. Burkhart refused his medications at 9:00 p.m.

4    Nursing staff found Mr. Burkhart dead in his bed in the early morning of Sunday,

5  October 26, 2003.  Dr. Mike Bannout, the physician on duty, examined Mr. Burkhart. Mr.

6  Burkhart's pupils were fixed and dilated.  There were no breath or heart sounds, and Mr.

7  Burkhart had no pulse.  Dr. Bannout pronounced Mr. Burkhart dead at 6:48 a.m.

8    At Ms. Burkhart's request, VA pathologist Dr. Terry Morgan conducted an autopsy

9  on Mr. Burkhart on November 3, 2003.  In the autopsy report, Dr. Morgan, estimated Mr.

10  Burkhart's weight as approximately 190 pounds.  The autopsy showed evidence of

11  extensive coronary artery disease, an old myocardial infarction, and multi-infarct dementia.

12  Dr. Morgan found that "[t]he bypass grafts appeared intact and no subacute myocardial

13  infarction," but given Mr. Burkhart's history of heart disease and "the absence of an

14  alternate explanation, he likely died from acute myocardial infarction."

15    The death certificate lists the cause of death as "coronary artery disease" and "multi-

16  infarct dementia," and lists "congestive heart failure, diabetes mellitus, hypertension,

17  osteomyelitis" as conditions contributing to death.

18    On August 30, 2005, Ms. Burkhart filed a claim with the VA dependency and

19  indemnity compensation (DIC) under 38 U.S.C. § 1151, death pension, and accrued

20  benefits.

21    On or about October 21, 2005, the VA received two administrative claim forms –

22  both signed by Ms. Burkhart – seeking two million dollars.  On September 28, 2006, the VA

23  denied Ms. Burkhart's claims, and on June 1, 2007, denied her request for reconsideration.

24    On August 31, 2007, the VA advised Ms. Burkhart that her claim for DIC had been

25  granted, and that her claim for death pension and accrued benefits had been denied.  In

26  order to support a DIC claim under 38 U.S.C. § 1151, the claimant must provide evidence

27  showing that the deceased veteran died as a result of undergoing VA hospitalization,

28  medical or surgical treatment, examination, or training; and that the death was either the

United States District Court

For the Northern District of California

direct result of VA fault, such as carelessness, negligence, lack of proper skill, or error in

judgment, or not a reasonably expected result or complication of the VA care or treatment,

or the direct result of participation in a VA Vocational Rehabilitation and Employment or

compensated work therapy program.  38 U.S.C. § 1131(a).

The Rating Decision, dated August 24, 2007, which was attached to the VA benefit

decision letter, states,

> Records show death due to coronary artery disease in October 2003, while
> hospitalized at Livermore.  Medical review established that death was not due
> to carelessness, negligence, lack of proper skill, error in judgment, or similar
> fault, but the reviewer did establish that death was the result of an event not
> reasonably foreseeable.  Since the reviewer established that death was due
> to an event not reasonably foreseeable, benefits under this provision of law
> may be granted.

On October 26, 2007, Ms. Burkhart as personal representative of the Estate, filed

the complaint in the present action, alleging medical malpractice, elder neglect, and

negligence against the VA.  The VA moved to dismiss the complaint on the ground the

United States is the only proper defendant in a Federal Tort Claims Act action.  The court

granted the motion with leave to amend on May 14, 2008.

On June 4, 2008, plaintiffs David T. Burkhart, Ms. Burkhart, and Ms. Burkhart on

behalf of the Estate filed a First Amended Complaint ("FAC").  Ms. Burkhart, as the

representative of the Estate, alleges medical malpractice and elder neglect under

California's Elder Abuse and Dependent Adult Act.  Ms. Burkhart, in her individual capacity,

and David T. Burkhart both allege wrongful death.

In the FAC, plaintiffs allege that VA medical personnel failed to properly diagnose

and treat Mr. Burkhart.  They base the malpractice and wrongful death claims on the

following allegations: (1) that VA staff gave lisinopril to Mr. Burkhart in September 2002,

causing cardiac arrest; (2) that VA Palo Alto Hospital staff refused to admit Mr. Burkhart on

September 21, 2003; (3) that on September 29, 2003, VA Palo Alto Staff gave Mr. Burkhart

Haldol® and Ativan®; (4) that Mr. Burkhart had blood in his urine prior to his transfer to VA

Livermore; (5) that VA Livermore staff gave Mr. Burkhart Vicodin®; (6) that VA Livermore

staff did not adequately test Mr. Burkhart's glucose level; (7) that VA Livermore staff did not

9

United States District Court

For the Northern District of California

1 treat Mr. Burkhart for acute pneumonia; (8) that VA Livermore staff caused dehydration,

2 weight loss, and strength loss in Mr. Burkhart; (9) that Dr. Kuo (at VA Livermore) did not

3 leave orders to monitor Mr. Burkhart on weekends; (10) that Dr. Kuo stopped Mr.

4 Burkhart's medications; (11) that Mr. Burkhart was admitted to hospice care at VA

5 Livermore; (12) that Mr. Burkhart was not on "full code" at VA Livermore; and (13) that the

6 VA did not weigh Mr. Burkhart's body during the autopsy.

7                                         **DISCUSSION**

8 A.      Legal Standard

9         Summary judgment is appropriate when there is no genuine issue as to material

10 facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.

11 Material facts are those that might affect the outcome of the case. Anderson v. Liberty

12 Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there

13 is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id.

14        A party seeking summary judgment bears the initial burden of informing the court of

15 the basis for its motion, and of identifying those portions of the pleadings and discovery

16 responses that demonstrate the absence of a genuine issue of material fact. Celotex Corp.

17 v. Catrett, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof

18 at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other

19 than for the moving party. Southern Calif. Gas. Co. v. City of Santa Ana, 336 F.3d 885,

20 888 (9th Cir. 2003).

21        On an issue where the nonmoving party will bear the burden of proof at trial, the

22 moving party can prevail merely by pointing out to the district court that there is an absence

23 of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 324-25. If the

24 moving party meets its initial burden, the opposing party must then set forth specific facts

25 showing that there is some genuine issue for trial in order to defeat the motion. See Fed.

26 R. Civ. P. 56(e); Anderson, 477 U.S. at 250.

27 B.      Defendant's Motion

28        The United States argues that plaintiffs' malpractice and wrongful death claims fail

United States District Court

For the Northern District of California

1   because they cannot establish a breach of the standard of care, causation, or injury; that

2   the elder neglect claim fails because the Estate cannot establish, by clear and convincing

3   evidence, that the VA is liable for neglect or physical abuse; that any claims by the Estate

4   relating to treatment in September 2002 are untimely; and that the court lacks subject

5   matter jurisdiction over David T. Burkhart's claim.

6          Plaintiffs submitted an opposition of three and a half pages, which addresses only

7   five of the alleged incidents of malpractice or neglect listed above.  Plaintiffs also submitted

8   a declaration by Sally Burkhart, attaching as exhibits a number of documents.  The

9   declaration does not purport to state any facts that could be considered evidence, and the

10  opposition does not cite to any of the exhibits attached to Ms. Burkhart's declaration.  The

11  United States objects to the declaration because it was not signed under penalty of perjury,

12  and also objects to the admission of most of the exhibits as inadmissible hearsay and as

13  lacking foundation.

14          1.      Malpractice and wrongful death claims

15          The United States argues that the malpractice and wrongful death claims fail

16  because plaintiffs cannot establish a breach of the standard of care, causation, or injury.

17          The elements of a wrongful death cause of action are the negligence or other

18  wrongful act; the resulting death; and damages consisting of pecuniary loss suffered by the

19  heirs.  Quiroz v. Seventh Ave. Ctr., 140 Cal. App. 4th 1256, 1263-64 (2006).  The elements

20  of a claim of medical malpractice are a duty to use such skill, prudence, and diligence as

21  other members of the medical profession commonly possess and exercise; a breach of that

22  duty; a proximate causal connection between the negligent conduct and the injury; and

23  resulting loss or damage.  Gami v. Mullikin Med. Ctr., 18 Cal. 4th 870, 877 (1993).

24          The United States' first main argument is that plaintiffs have no admissible evidence

25  of malpractice – and therefore cannot establish breach of the standard of care, causation,

26  or injury – because they have no competent expert testimony to establish that any medical

27  provider breached a duty of care to Mr. Burkhart or caused him injury.

28          The standard of care in a medical malpractice case is a matter "peculiarly within the

United States District Court

For the Northern District of California

1   knowledge of experts," and expert testimony is required to "prove or disprove that the

2   defendant performed in accordance with the standard of care." Kelley v. Trunk, 66 Cal.

3   App. 4th 519, 523 (1998).  Moreover, in medical malpractice cases, causation and injury

4   generally must be proven within reasonable medical probability based on competent expert

5   testimony. Jennings v. Palomar Pomerado Health Sys., Inc., 114 Cal. App. 4th 1108, 1118

6   (2003).

7          Here, the United States notes, plaintiffs have designated no experts, despite

8   receiving numerous continuances of the deadline for doing so.  Expert disclosures were

9   originally due on November 3, 2008.  At plaintiffs' request, the United States agreed to

10  stipulate to an extension to November 17, 2008.  Plaintiffs requested a further extension,

11  and the United States ultimately stipulated to a December 31, 2008 date for plaintiffs'

12  disclosure of their expert.  Despite these extensions, plaintiffs never disclosed an expert.

13         In their opposition, plaintiffs assert that the award of DIC benefits states that the

14  award was based on the determination that the death of Mr. Burkhart was "caused by" the

15  care he received from the VA.  Based on this, plaintiffs claim that the medical malpractice is

16  "documented."

17         At the hearing on the motion, plaintiffs asserted that they had been unable to retain

18  an expert to testify to the standard of care.  They claimed that in addition to the "financial

19  aspect of hiring an expert," the medical professional(s) they had consulted had advised

20  them that certain information was not in the medical records.  Plaintiffs asserted that they

21  had not received all the documents they requested from the United States in discovery,

22  referring specifically to a report purportedly prepared by a "VA doctor" in connection with

23  Ms. Burkhart's application for DIC benefits under 38 U.S.C. § 1151.

24         As the court advised plaintiffs at the hearing on the present motion, however, the

25  remedy for incomplete responses to discovery requests is a motion to compel discovery.

26  Nevertheless, despite a continuance of the discovery cut-off date from December 15, 2008,

27  to January 30, 2009,  plaintiffs did not file a motion to compel, and did not in any way bring

28  this issue to the court's attention prior to the day of the hearing on the present motion.

United States District Court

For the Northern District of California

1      Nor did plaintiffs seek relief under Federal Rule of Civil Procedure 56(f).  To the

2   extent that their statements at the hearing could be construed as a request for a

3   continuance under Rule 56(f), the court finds that the request must be denied, as plaintiffs

4   have not established that the report they seek (assuming it exists) would constitute

5   evidence sufficient to create a triable issue regarding the alleged malpractice.  See Tatum

6   v. City & County of San Francisco, 441 F.3d 1090, 1100 (9th Cir. 2006) (party requesting

7   continuance pursuant to Rule 56(f) "must identify by affidavit the specific facts that further

8   discovery would reveal, and explain why those facts would preclude summary judgment").[1]

9      Ms. Burkhart's receipt of DIC benefits under 38 U.S.C. § 1151 is not evidence of VA

10   liability for malpractice or elder neglect related to treatment of Mr. Burkhart.  As the United

11   States has shown, VA cardiologist Dr. Edmund Keung, in his review for the VA's

12   Compensation and Pension Office, dated August 17, 2007, concluded that Mr. Burkhart's

13   death "was not caused by or as a result of carelessness, negligence, lack of proper skill,

14   error in judgment, or similar instance of fault on the part of the Department in furnishing the

15   hospital care, medical or surgical treatment, or examination," but rather, "was most likely

16   caused by an event not reasonably foreseeable."  Thus, nothing in the DIC review or award

17   of benefits suggests a basis for a claim of malpractice.

18      As noted above, DIC benefits may be awarded where death was "caused by"

19   neglect or carelessness, or "by an event not reasonably foreseeable."  38 U.S.C. § 1151(a).

20   Here, benefits were awarded based on death caused by an event not reasonably

21   foreseeable.  The benefit decision specifically states that death was not caused by

22   negligence, carelessness, lack of proper skill, or error in judgment.

23      The United States' second main argument is that the evidence it has submitted

24   

---

25      [1] Nor have plaintiffs established good cause for relief under Rule 56(f) – that is, specific
reasons justifying their failure to seek court intervention to obtain such evidence earlier in the
26   proceeding.  The court notes that like any litigants, pro se litigants are "bound by the rules of
procedure."  Ghazali v. Moran, 46 F.3d 52, 54 (9th Cir. 1995) (citation omitted); see also
27   Briones v. Riviera Hotel & Casino, 116 F.3d 379, 382 (9th Cir. 1997).  Although the court
construes plaintiffs' filings liberally, plaintiffs are still required to follow proper procedures, and
28   it is not the court's function "to supervise laymen in the practice of law."  Springer v. Best, 264
F.2d 24, 25 (9th Cir. 1959).

United States District Court

For the Northern District of California

shows that the VA did not breach the standard of care causing injury to Mr. Burkhart.  The United States retained Dr. Byron K. Lee, a cardiologist at the University of California, San Francisco, and Dr. Robert J. Margolin, a geriatrician, as its expert witnesses.  Dr. Lee and Dr. Margolin reviewed all Mr. Burkhart's medical records, and concluded that no breach of the standard of care by VA staff caused Mr. Burkhart any injury.

The United States addresses each of the thirteen main allegations of malpractice raised by plaintiffs throughout this litigation.  As noted above, plaintiffs responded to the arguments regarding only five of the thirteen allegations.  These are the claim that Mr. Burkhart suffered cardiac arrest caused by the administration of lisinopril in September 2002; the claim that VA Palo Alto improperly refused to admit Mr. Burkhart on September 21, 2003; the claim that VA Palo Alto improperly administered Haldol® and Ativan® to Mr. Burkhart on September 29, 2003; the claim that VA Livermore staff caused Mr. Burkhart to become dehydrated and to lose weight and strength; and the alleged failure by VA Livermore to place Mr. Burkhart on "full code."  Accordingly, the court does not address the remaining eight allegations, as the United States has provided evidence showing that summary judgment is proper as to those claims.

First, with regard to the alleged improper administration of lisinopril to Mr. Burkhart in September 2002, the United States asserts that there is no evidence in the medical records that Mr. Burkhart suffered cardiac arrest at VA Palo Alto after having been administered lisinopril in September 2002, and no evidence that he was admitted to Good Samaritan Hospital in October 2003 for cardiac arrest.

The United States' expert Dr. Lee found no evidence that the administration of lisinopril caused Mr. Burkhart any injury, and concluded that there was no plausible connection between lisinopril given to Mr. Burkhart in 2002 and his death more than a year later in October 2003.  In his declaration, Dr. Lee indicates that while lisinopril may cause high potassium levels in some patients, with a worsening of kidney function, those effects typically reverse once the lisinopril is stopped.  He notes that the medical records show that approximately two days after the lisinopril was discontinued, Mr. Burkhart's potassium

United States District Court

For the Northern District of California

1   levels and kidney function had returned to normal.

2       In opposition, plaintiffs contend that in September 2002, Mr. Burkhart was prescribed

3   lisinopril, which they claim is a drug known to cause an allergic reaction.  Plaintiffs assert

4   that as a result of being administered the lisinopril, Mr. Burkhart suffered from a

5   documented increase in his white blood cell count, and also suffered "heart-attack-type

6   symptoms" and a "measured abnormal heart measurement."

7       The court finds that there is no evidence that lisinopril caused any injury to Mr.

8   Burkhart.  In particular, plaintiffs have no admissible evidence of the alleged "heart attack

9   type symptoms" or the "abnormal heart measurement."  Moreover, Dr. Lee found no

10  indication in the medical records that Mr. Burkhart had suffered cardiac arrest as a result of

11  the administration of lisinopril, and concluded that it was highly unlikely that lisinopril would

12  have caused or contributed to Mr. Burkhart's October 3, 2002 admission to Good

13  Samaritan Hospital.

14      Second, with regard to the claim that VA Palo Alto staff improperly refused to admit

15  Mr. Burkhart on September 21, 2003, the United States argues that there is no evidence

16  that the VA breached a standard of care in failing to admit Mr. Burkhart on that occasion.

17  Rather, the United States contends, the evidence shows that the emergency room

18  physician, Dr. Lai, obtained a thorough medical history and performed a physical

19  examination that included laboratory testing.  Dr. Lee concluded that the VA did not breach

20  a standard of care in refusing to admit Mr. Burkhart on September 21, 2003, as nothing in

21  Dr. Lai's test results or examination showed an acute medical condition requiring that Mr.

22  Burkhart be admitted to the hospital.

23      In opposition, plaintiffs argue that Mr. Burkhart was "denied" medical care in

24  September 2003.  They claim that he was released from VA Palo Alto before he was

25  properly treated for his condition ("nausea, mental confusion, weakness, and related

26  issues").  They assert that within two days of the date he was released from VA Palo Alto,

27  he was admitted to the emergency room at Good Samaritan Hospital, for "symptoms

28  similar to a heart attack," and that after the stay at Good Samaritan, he was transferred to

15

1   VA Palo Alto.

2          The court finds that plaintiffs have provided no evidence that the determination by

3   VA Palo Alto staff not to admit Mr. Burkhart to VA Palo Alto on September 21, 2003 was

4   not in accordance with the standard of care.  The standard of care in a medical malpractice

5   case is a matter within the knowledge of experts, and since plaintiffs have no experts, they

6   cannot establish that Dr. Lai or anyone at VA Palo Alto breached the standard of care.

7   Moreover, the United States' expert, Dr. Lee, states that Dr. Lai did <u>not</u> breach the standard

8   of care in refusing to admit Mr. Burkhart.  In addition, plaintiffs have provided no evidence

9   supporting the claim that Mr. Burkhart was admitted to Good Samaritan in September 2003

10  with "symptoms similar to a heart attack."

11         Plaintiffs also raise another issue, not previously alleged – that Mr. Burkhart was

12  "prematurely transferred" from VA Palo Alto to VA Livermore on September 29, 2003.

13  Plaintiffs claim that this "premature" transfer was medical care that fell below the standard

14  of care for a person with Mr. Burkhart's medical problems.

15         The evidence shows, however, that as of September 25, 2003, Mr. Burkhart's

16  laboratory and diagnostic test results indicated that there were no acute medical issues

17  preventing his discharge from VA Palo Alto.  Dr. Donna Heinle, the Medical Director of VA

18  Livermore, states in her declaration that VA Livermore is a skilled nursing facility that

19  provides long-term "custodial" care to patients.  Because Mr. Burkhart's various chronic

20  illnesses were stable, Dr. Joshua Knowles arranged for Mr. Burkhart's transfer to VA

21  Livermore to allow his family additional time to resolve their disagreements regarding where

22  Mr. Burkhart was to be placed.[2]  VA staff did not breach the standard of care by transferring

23  Mr. Burkhart from VA Palo Alto to VA Livermore, as he was stable and there is no evidence

24  showing that he required continuing hospitalization for acute conditions.

25

26  _____

27         [2] As noted above, Mr. Burkhart was not in the veteran class that would be qualified for
    a permanent placement at VA Livermore (as his medical conditions were not service-related),
    but in the opinion of all medical providers, he needed to be in a nursing home, rather than
28  being placed with his wife at home, as she was not capable of providing the kind of care he
    needed.  However, she was resisting a placement in a private nursing home.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1   Third, with regard to the claim that VA Palo Alto staff improperly administered

2 Haldol® and Ativan® to Mr. Burkhart on September 29, 2003, the United States asserts

3 that these medications were appropriate for Mr. Burkhart because he was combative,

4 uncooperative, and agitated, and because Mr. Burkhart had no contraindications for either

5 medication.  The United States' experts Dr. Lee and Dr. Margolin both concluded that VA

6 staff did not breach the standard of care by administering these medications to Mr.

7 Burkhart.  Moreover, the United States notes, plaintiffs have no evidence (and the records

8 do not show) that Mr. Burkhart suffered any injury from the Haldol® or the Ativan®.

9   In opposition, plaintiffs contend that the medication was not appropriate for Mr.

10 Burkhart, although they do not explain why; and that the VA administered it for the sole

11 purpose of making it easier for the medical staff to handle the transport to VA Livermore.

12 In her declaration in support of the opposition, Ms. Burkhart suggests that Haldol® may

13 cause some problems for cardiac patients, although plaintiffs do not make this argument in

14 their opposition brief.

15   In her declaration, Ms. Burkhart refers to three exhibits – Exhibit D (copies of pages

16 from "Legal and Healthcare Ethics for the Elderly" which states that it is unethical to give

17 drugs to elderly nursing home patients "ostensibly to control such behavior as aggression,

18 verbal abusiveness, and wandering"); Exhibit G (a one-page exhibit that bears a "US"

19 Bates number, which appears to be taken from a treatise or handbook, and which

20 discusses Haloperidol and its possible side effects); and Exhibit N (a U.S. Food and Drug

21 Administration "alert" regarding the use of Haloperidol, stating that it is not approved for

22 intravenous administration).

23   The court finds no evidence that VA staff breached the standard of care in giving

24 Haldol® to Mr. Burkhart.  Moreover, both Dr. Lee and Dr. Margolin have testified to the

25 contrary.  Nor is there any evidence that the administration of Haldol® caused any injury to

26 Mr. Burkhart.  As for the exhibits to the Sally Burkhart declaration, none of them, even were

27 they admissible, support what appears to be plaintiffs' claim that administration of Haldol®

28 is not appropriate for cardiac patients.

United States District Court

For the Northern District of California

1   Fourth, with regard to the claim that VA Livermore staff caused Mr. Burkhart to suffer

2   dehydration, weight loss, and strength loss, the United States argues that plaintiffs have no

3   evidence to support this claim.  Mr. Burkhart weighed 174 pounds on September 29, 2003,

4   and approximately 165 pounds on October 21, 2003.  Dr. Margolin found both these

5   weights to be within normal range.  In addition, the autopsy found no temporal wasting or

6   muscle atrophy.  Medical records show that while Mr. Burkhart was at times refusing to eat,

7   he was still taking liquids.

8       Dr. Margolin found no evidence in the record of significant weight loss or dehydration

9   caused by the staff at VA Livermore.  Dr. Margolin concluded, based on records

10  documenting the fact that Mr. Burkhart's strength had been declining for months prior to his

11  death as a result of his multiple ongoing illnesses, that VA Livermore staff met the standard

12  of care in treating Mr. Burkhart's multiple chronic illnesses and in responding to his

13  nutritional needs.  Dr. Lee also concluded that it was highly unlikely that dehydration or

14  malnutrition led to Mr. Burkhart's death.

15      Plaintiffs do not respond to this argument, other than to claim that Mr. Burkhart's

16  October 2003 medical records document "a loss of weight, loss of appetite, change in

17  medication, growing weakness, decline in mental attitude all culminating in his death on

18  October 26, 2003."

19      The court finds that plaintiffs have provided no evidence that these symptoms

20  (weight loss, loss of appetite, growing weakness, or decline in mental attitude) were caused

21  by any breach of the standard of care by VA medical providers, or by any wrongful conduct

22  by VA staff.  Indeed, as the United States notes, Ms. Burkhart acknowledged in her

23  deposition that prior to his admission to VA Palo Alto Hospital in September 2003, Mr.

24  Burkhart had not been eating, had been vomiting, and had been growing weaker.

25      The medical records clearly document the attempts by VA staff to get Mr. Burkhart

26  to eat, take his medication, and so forth, and also establish that a VA dietician made

27  numerous follow-up evaluations of Mr. Burkhart's nutritional status, and made numerous

28  recommendations intended to get him to eat more.

United States District Court

For the Northern District of California

1    Fifth, with regard to the claim that VA Livermore improperly failed to place Mr.

2  Burkhart on "full code," the United States asserts that the evidence shows that based on

3  Mr. Burkhart's express wishes, Dr. Kuo listed his code status as "DNR/unwitnessed" at VA

4  Livermore.  Dr. Kuo explains in her declaration that "code status" describes procedures that

5  can be performed on a patient in the case of cardiac or respiratory arrest, and that "full

6  code" means that cardio-pulmonary resuscitation (CPR) and intubation (placement of tube

7  in patient's trachea) if necessary for mechanical ventilation, will be performed on patients

8  suffering from cardiac and/or respiratory arrest.  She adds that "full code" is always the

9  default position, and patients are generally considered "full code" until and unless their

10  physicians have discussed the patient's wishes, either with the patient or with his surrogate

11  decision-maker.

12    In this case, Dr. Kuo discussed the options with Mr. Burkhart, and determined,

13  based on that discussion, that Mr. Burkhart wished to be placed on "DNR/unwitnessed"

14  status.  According to Dr. Kuo, "DNR" means that no CPR will be administered; and

15  "DNR/unwitnessed" means that if the patient is found in the midst of cardiac or respiratory

16  arrest, CPR can be administered, but if the patient is found without breath or pulse, no

17  resuscitative efforts will be made.  Upon Mr. Burkhart's arrival at VA Livermore, Dr. Kuo

18  determined that he had the mental capacity to understand the information she provided,

19  and to make decisions regarding his treatment options.  Based on his expressed wishes,

20  she wrote a "DNR/unwitnessed" order.

21    Notwithstanding all this, Dr. Lee concluded that Mr. Burkhart's status did not affect

22  his survival on October 26, 2003.  Mr. Burkhart had likely been dead for over an hour when

23  he was found.  He had no breath, no pulse, no heart sounds, and his pupils were dilated

24  and fixed.  According to Dr. Lee, resuscitation typically needs to commence within minutes

25  for survival.

26    Plaintiffs do not respond to this argument, other than to assert that "[t]here are no

27  medical records that show that any life saving practice was implemented to save Dave

28  Burkhart at the time of his death."

United States District Court

For the Northern District of California

1    Based on the evidence presented by the United States, the court finds that the

2  "DNR" code was placed on Mr. Burkhart's file at his request, following discussion with his

3  treating physician at VA Livermore.  Plaintiffs have provided no evidence that Mr. Burkhart

4  at any time requested that he be placed on "full code" while at VA Livermore.  At most, the

5  evidence suggests that Ms. Burkhart wanted her husband to be on "full code."  However,

6  there is no indication that Mr. Burkhart lacked the mental capacity to make this decision for

7  himself.  In addition, the court notes that Dr. Lee opined that even if Mr. Burkhart had been

8  on "full code," that would not have prevented his death.

9    In sum, the court finds that plaintiffs have provided no evidence sufficient to raise a

10  triable issue as to any of their claims of medical malpractice, and that based on the

11  evidence provided by the United States, the motion for summary judgment must be

12  GRANTED on the malpractice and wrongful death claims.

13    2.    Elder neglect claim

14    The United States asserts that the Estate cannot establish, by clear and convincing

15  evidence, that neglect by VA staff caused injury to Mr. Burkhart.  Under the Elder Abuse

16  and Dependent Adult Act, Cal. Welf. & Inst. Code § 15600, et seq., heightened remedies

17  are available to plaintiffs that prove, by clear and convincing evidence, that a defendant is

18  liable for neglect or physical abuse, and that the defendant acted with recklessness,

19  oppression, fraud, or malice.  Sababin v. Superior Court, 144 Cal. App. 4th 81, 88 (2006);

20  see also Intrieri v. Superior Court, 117 Cal. App. 4th 72, 82-83 (2004).

21    Here, the United States asserts, the Estate's elder neglect claim is based on the

22  same allegations as plaintiffs' malpractice and wrongful death claims.  Thus, because there

23  is no evidence – let alone clear and convincing evidence – that any of the alleged wrongful

24  acts of the VA caused injury to Mr. Burkhart, the United States argues that the Estate

25  cannot prevail on the elder abuse claim.

26    Plaintiffs do not respond to this argument, and the court finds that the motion must

27  be GRANTED.  It is undisputed that the nurses at VA Livermore regularly attended to Mr.

28  Burkhart, and provided him with wound care, meals, and medications; and that Mr.

United States District Court
For the Northern District of California

1   Burkhart received appropriate medications for his numerous chronic medical conditions,

2   and also received regular nutrition assessments, regular physician visits, and the

3   opportunity for physical therapy.  Plaintiffs have provided no evidence that VA staff acted

4   with recklessness, and the United States' experts have testified that VA staff did not breach

5   the standard of care, much less deliberately disregard Mr. Burkhart's health.

6          3.      Claims relating to treatment in September 2002

7          The United States argues that any malpractice or elder neglect claims by the Estate

8   based on treatment Mr. Burkhart received from the VA in 2002 are time-barred.

9          A tort claim against the United States shall be forever barred unless it is
           presented in writing to the appropriate Federal agency within two years after
10         such claim accrues or unless action is begun within six months after the date
           of mailing, by certified or registered mail, of notice of final denial of the claim
11         by the agency to which it was presented.

12   28 U.S.C. § 2401(b).  A medical malpractice claim accrues when the plaintiff knows of both

13   the existence of an injury and its cause.  United States v. Kubrick, 444 U.S. 111, 122-23

14   (1979).

15         The Estate asserts that lisinopril given to Mr. Burkhart around September 23, 2002

16   at VA Menlo Park caused him to go into cardiac arrest at about the same time.  The

17   evidence shows that Mr. Burkhart knew of any alleged injury and its probable cause in late

18   September 2002.

19         David T. Burkhart testified at his deposition that he learned of the alleged cardiac

20   arrest from his father when his father was admitted to the hospital.  Ms. Burkhart testified

21   that after Mr. Burkhart was treated at VA Palo Alto, he was discharged to Terreno Gardens

22   (a nursing home) because, while he could have gone back to VA Menlo Park, "I didn't want

23   him to go there because they had given him the wrong medicine, so we found a nursing

24   home by our home."

25         Plaintiffs do not directly respond to this argument.  They do, however, assert that the

26   treatment of Mr. Burkhart in September 2002 constituted medical malpractice.

27         The court finds that the motion must be GRANTED.  Because the administrative

28   claim was filed in October 2005, a year after the limitations period had expired, the Estate's

claims relating to September 2002 treatments are untimely.

4.   David T. Burkhart's claim

The United States argues that the court lacks subject matter jurisdiction over David T. Burkhart's claim because he did not timely file his complaint and did not file a proper administrative claim.  Because the court finds that summary judgment must be granted as to the medical malpractice and wrongful death claims, the court finds it unnecessary to address the additional arguments regarding David T. Burkhart's claims.

## CONCLUSION

In accordance with the foregoing, the court GRANTS the United States' motion for summary judgment.  Plaintiffs bear the burden of proof on all their claims, and the United States has shown "that there is an absence of evidence to support the nonmoving party's case."  Celotex, 477 U.S. at 324-25.  In order to defeat the motion, plaintiffs must "set forth specific facts showing that there is some genuine issue for trial."  Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 250.  Plaintiffs have not done this.

The United States has filed objections to the Declaration of Sally Burkhart and the attached exhibits.  Even were the court to overrule the objections, plaintiffs have not cited to any of the "evidence" in their opposition, and therefore it is impossible to know what evidence they claim supports their opposition.  The court has no duty to rummage through the record to find an issue of material fact that would salvage plaintiff's claim.  See Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir.1996).  Notwithstanding that, a review of plaintiffs' submissions fails to turn up evidence that would create such an issue.

**IT IS SO ORDERED.**

Dated: April 21, 2009

_____
PHYLLIS J. HAMILTON
United States District Judge